BRENT M. RESH
(Nevada Bar No. 14940)
BRENT RESH LAW, PLLC
2401 La Solana Way
Las Vegas, NV 89102
(702) 781-6903
brent@brentreshlaw.com

JESSICA L. BLOME
(California Bar No. 314898, pro hac vice application forthcoming)
J. RAE LOVKO
(California Bar No. 208855), pro hac vice application forthcoming)
GREENFIRE LAW, PC
2748 Adeline Street, Suite A
Berkeley, CA 94703
(510) 900-9502
jblome@greenfirelaw.com
rlovko@greenfirelaw.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| WILD HORSE EDUCATION, a non-profit corporation, LAURA LEIGH, individually and on behalf of WILD HORSE EDUCATION, TAMMI ADAMS, individually and on behalf of WILD HORSE EDUCATION,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF INTERIOR, BUREAU OF LAND MANAGEMENT, BILL GROFFY, Principal Deputy Director and Acting Director of the Bureau of Land Management, and JUSTIN ABERNATHY, Nevada State Director of the Bureau of Land Management,<br><br>Defendants, | Case No. 3:26-cv-00896-MMD-CSD<br><br>**PLAINTIFFS' COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |

1. On August 6, 2026, the Bureau of Land Management (BLM) issued the Final Environmental Assessment (EA) for the Jackson Mountains Herd Management Area Plan (HMAP), DOI-BLM-NV-W030-2025-0002-EA, and its associated Finding of No Significant Impact (FONSI) and Decision Record (DR) (This DR, FONSI, and HMAP/EA are referred to collectively as the "Jackson Mountains Plan.").

2. Plaintiffs bring this case to challenge the Jackson Mountains Plan because it violates the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. § 1701 *et seq*., Wild Free-Roaming Horses and Burros Act (WHA), 16 U.S.C. § 1331, *et seq*., the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq*., and the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq*. Plaintiffs file this Complaint for Injunctive and Declaratory Relief to prevent BLM from implementing the Jackson Mountains Plan, including reliance on and implementation of the incorporated 2022 Gather Plan,  until such time as Defendants have complied with the FLPMA, WHA, NEPA, and the APA.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over the subject matter of this action pursuant to 5 U.S.C. § 706, 28 U.S.C § 1331, and 28 U.S.C. § 1361.

4. Venue is proper in this district court pursuant to 28. U.S.C. § 1391. BLM has sufficient contacts to subject it to personal jurisdiction in this district.

## THE PARTIES

5. Plaintiff Laura Leigh is the Founder and President of Plaintiff Wild Horse Education ("WHE"). In addition, Ms. Leigh works with multiple non-profit organizations engaged in public land issues and provides in-field documentation and commentary on public land issues such as wild horse and burro gathers and removals.

6. Plaintiff Tammi Adams is a volunteer, member, and the NEPA Program Coordinator of WHE.  She began volunteering exclusively with Wild Horse Education in 2020.

7. WHE a registered non-profit organization headquartered in Nevada whose purpose is the protection and sane management of wild horses and burros on public lands through educating the public, encouraging scientifically based management strategy for animals in the wild, promoting public adoptions of removed wild horses and supporting those who adopt, and assisting the public to advocate for the welfare and management of wild horses and burros.

8. WHE has an interest in ensuring that wild free-roaming horses and burros are treated as an integral part of public lands, management activities are conducted at the minimal level feasible, and management activities include development and consideration of land use plans and herd management area plans.

9. With more than 150,000 members, WHE's mission encompasses the protection of wild horses and burros as well as the health of the American West public rangelands upon which they live.

10. It is WHE's standard practice to send trained members of WHE to observe wild horse and burro gathers conducted by BLM throughout the United States. When observing gather operations, these members document the events by filming the operations on video, capturing photographs, and writing written reports from the area designated by BLM for public observers. It is also WHE's standard practice to make documentation of the wild horse and burro gathers and range data available to the public and to use this documentation to show and support any concerns directly to the BLM.

11. WHE members, including Plaintiffs Laura Leigh and Tammi Adams, advocate for and enjoy visiting wild horses and burros in the Jackson Mountains HMA. When visiting, they appreciate the natural beauty, wildlife, and wild horses in the Jackson Mountains HMA. Their visits bring enjoyment and allow for recreation, as well as documentation of wild horses, wildlife, and fauna.

12. Plaintiffs also have tracked wild horses into holding facilities, where horses are held until adoption.

13. WHE members and Plaintiffs Laura Leigh and Tammi Adams have visited the Jackson Mountains HMA multiple times in the past, and they intend to continue visiting the Jackson Mountains HMA well into the foreseeable future, including in 2026 and 2027.

14. During past gathers in the Jackson Mountains HMA, Plaintiff Laura Leigh has seen horses suffer distress, severe injury, and death as a result of BLM not ensuring humane handling procedures.

15. Plaintiffs' advocacy at Jackson Mountains HMA extends back more than a decade including litigation to address humane handling concerns during a prohibited helicopter gather conducted during foaling season.

16. Based on their repeated and regular visits to the Jackson Mountains HMA, WHE members and Plaintiffs Laura Leigh and Tammi Adams have aesthetic, recreational, and conservation interests in the wild horses, wildlife, and public lands of the Jackson Mountains HMA.

17. Plaintiffs' aesthetic, recreational, and conservation interests in the wild horses, wildlife, and public lands of the Jackson Mountains are harmed by the mismanagement of these resources.

18. The Jackson Mountains Plan arbitrarily and capriciously provides for the overly aggressive removal and sterilization of wild horses, which unlawfully harms Plaintiffs' aesthetic, recreational, and conservation interests in the horses residing in the HMA. Ms. Leigh, Ms. Adams, and other WHE members and supporters have grave concerns that past, present, and future BLM actions regarding wild horses in the Jackson Mountains HMA will adversely affect their ability to recreate and enjoy the wild horses of these herds in the future.

19. The Jackson Mountains Plan arbitrarily and capriciously assesses TNEB without adhering to BLM's multiple use mandate, which unlawfully harms Plaintiffs' aesthetic, recreational, and conservation interests in the HMA's wildlife and public lands. Ms. Leigh, Ms. Adams, and other WHE members and supporters have grave concerns that past, present, and

future BLM actions regarding wild horses in the Jackson Mountains HMA will adversely affect their ability to recreate and enjoy the wildlife and public lands of the HMA in the future.

20. Implementation of the Jackson Mountains Plan also dissuades Plaintiffs, WHE members, and the stake-holding American public from visiting Nevada's public lands and the Jackson Mountains HMA, removes their spending/revenue to Nevada, and reduces the value of their experiences should they visit the HMA.

21. Plaintiffs' aesthetic, recreational, and conservation interests have been, and will continue to be, injured by Defendants' failure to comply with their obligations under the FLPMA, WHA, NEPA, and APA.

22. The injunctive and declaratory relief requested provides the only remedy that can redress the injuries of Plaintiffs. The relief requested by Plaintiffs, if granted, would require Defendants to comply with the requirements of the FLPMA, WHA, NEPA, and APA.

23. The relief requested by Plaintiffs, if granted, would provide for appropriate site-specific management of the wild horse herds in the Jackson Mountains HMA and reduce the number of wild, free-roaming horses needlessly injured, killed, or removed by Defendants.

24. The relief requested by Plaintiffs, if granted, would provide for appropriate site-specific analysis and consideration of the impact of all resources that impact the HMA's TNEB, including the impact of livestock, mining projects, and more.

25. Plaintiffs filed a timely appeal of the Jackson Mountains Plan before the IBLA.

26. Defendant BILL GROFFY is the Principal Deputy Director and Acting Director of the Bureau of Land Management, and is charged by federal statute with managing, administering, and protecting the wild horses and burros in the United States, including the Jackson Mountains HMA, pursuant to the WHA.

27. Defendant JUSTIN ABERNATHY is the acting Nevada State Director of BLM, and is charged by federal statute with managing, administering, and protecting the wild horses and burros in the State of Nevada, including the Jackson Mountains HMA, pursuant to the WHA.

28. Defendant UNITED STATES DEPARTMENT OF INTERIOR, BUREAU OF LAND MANAGEMENT is charged by federal statute to manage administer and protect the wild horses and burros in the State of Nevada, including the Jackson Mountains HMA, pursuant to the WHA.

## LEGAL FRAMEWORK

### A. Federal Land Policy and Management Act

29. The FLPMA was adopted to ensure that public lands are managed in a manner that protects the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, archeological, recreational, and wildlife values. 43 U.S.C. § 1701.

30. BLM must manage the public lands under principles of multiple use and sustained yield. *Id*. at § 1732.

31. Multiple use "means the management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people; making the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions; the use of some land for less than all of the resources; a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and nonrenewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values; and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output." *Id*. at § 1702(c).

32. BLM also shall prepare and maintain on a continuing basis an inventory of all public lands and their resources and other values (including, but not limited to, outdoor recreation

and scenic values). This inventory shall be kept *current* so as to reflect changes in conditions and to identify new and emerging resource and other values." *Id.* at § 1711(a) (emphasis added).

33. The term "sustained yield" means the achievement and maintenance in perpetuity of a high-level annual or regular periodic output of the various renewable resources of the public lands consistent with multiple use. *Id.* at § 1702(h).

34. The WHA incorporates the FLPMA's multiple use mandate. 16 U.S.C. §§ 1332-1333.

35. In keeping with its multiple use mandate, BLM's management decisions must not give priority to particular users, but instead, the agency must first take into account all pertinent factors, including but not limited to the relative values of the various resources in particular areas. *Am. Horse Prot. Asso. v. Frizzell*, 403 F. Supp. 1206, 1221 (D. Nev. 1975). "[N]o animal should be given a higher priority than another." *Am. Wild Horse Campaign v. Stone-Manning*, 2024 U.S. Dist. LEXIS 152048, at *58 (D. Wyo. Aug. 14, 2024). Where wild horses and cattle both use the land, "neither … possess any higher status than the other." *Am. Horse Prot. Asso.*, 403 F. Supp. at 1221.

**B. <u>Wild Free-Roaming Horses and Burros Act</u>**

36. The WHA is our basic national charter to protect wild free-roaming horses and burros as "living symbols of the historic and pioneer spirit of the West," recognizing that "they contribute to the diversity of life forms within the Nation and enrich the lives of the American people." 16 U.S.C. § 1331. Congress enacted the WHA to ensure that "wild-free roaming horses and burros shall be protected from capture, branding, harassment, [and] death," and will "be considered in the area where presently found, as an integral part of the natural system of the public lands." *Id.*

**Herd Management Areas and Herd Management Area Plans**

37. Under the WHA, BLM "shall maintain a record of the herd areas that existed in 1971, and a current inventory of the numbers of animals and their areas of use." 43 C.F.R. §

4710.2. A herd area (HA) is the geographic designation made by BLM of public land where wild horses resided at the time the WHA was enacted. 43 C.F.R. §§ 4700-0.5, 4710.2, 4710.4. Where BLM has determined that the agency will manage wild horses long-term in the whole or a part of an HA, BLM designates this land as a Herd Management Area (HMA). 43 C.F.R. § 4710.3-1.

38. For all HMAs, BLM "shall … inventory and monitor herd and habitat characteristics." 43 C.F.R. § 4710.2.

39. For all HMAs, BLM "shall prepare a herd management area plan, which may cover one or more herd management areas." 43 C.F.R. § 4710.3-1. Management of wild horses and burros in an HMA "shall be at the minimum level necessary to attain the objectives identified in approved land use plans and herd management area plans." 43 C.F.R. §4710.4.

40. A herd management area plan (HMAP) is not defined in the WHA or its implementing regulations; however, BLM's Wild Horses and Burros Management Handbook defines the purpose and components of an HMAP, as well as the process by which HMAPs are created. H-4700-1 (BLM, 2010), pp. 10-11, 36-44. I

41. "HMAPs establish short- and long-term management and monitoring objectives for a specific [wild horse and burro] herd and its habitat." *Id.*, p. 11. Such objectives may include, but are not limited to, "objectives for herd composition, animal characteristics and habitat development needs." *Id.*, p. 10.

42. HMAPs may be prepared for a single HMA or a complex of adjacent HMAs where animal interchange occurs. When two or more jurisdictions have management responsibility for portions of a single HMA or an HMA complex, BLM will designate one field office with the lead responsibility for development of the HMAP and management of the HMA or complex. *Id.*, p. 11.

43. When preparing an HMAP, BLM acknowledges that the process requires "public involvement through a site-specific environmental analysis and decision process (NEPA)." *Id.*, p. 36.

44. The first step in preparing an HMAP involves an evaluation of current management that results in the production of a management evaluation report ("MER"). *Id.*, p. 37. The "key steps" for this evaluation are identified by BLM as: (1) Review existing goals and objectives for the herd and its habitat and determine whether these have been met, partly met, or not met. Incorporate a summary of the rationale supporting BLM's determination in the evaluation report. (2) Compare and contrast the existing and desired condition for the herd and its habitat. (3) Document the gaps (or differences) between the current and desired conditions. These differences represent the issues to be addressed and resolved (i.e., the purpose and need for action). (4) Identify the possible management actions that could be implemented in response to the identified issues. (5) Formulate a range of alternative management strategies for the herd and its habitat from the list of possible management actions (Proposed Action and Alternatives). Each alternative considered should meet the purpose and need for action and respond to the identified issues in whole or in part. (6) Finalize the MER and provide it to the public for a 30-day review and comment period (public scoping). *Id.*

45. The second step in preparing an HMAP involves conducting NEPA review through an interdisciplinary, site-specific analysis. *Id.*, pp. 37-38. For each analyzed alternative, BLM is to specify "(a) the proposed habitat and population management objectives, (b) the associated management actions (e.g. implementation objectives), and (c) the proposed monitoring objectives." *Id.*, p. 38.

46. Well-written objectives should be specific, measurable, achievable/attainable, reasonable/relevant and trackable within a specified timeframe (SMART). *Id.*, pp. 38-39.

47. For habitat management objectives, the objectives may address vegetation, trend or key area objectives for upland vegetation or riparian plant communities within the HMA or

complex or objectives to maintain or improve the wild, free-roaming behavior of the population. Site-specific objectives to improve habitat conditions (e.g., forage or water) may also be established." *Id.*, p. 39.

48. Population management objectives "establish a framework for management of the [wild horse and burro] herd over the longer term. Objectives could include when and how AML would be adjusted in the future, or when and how the population within the HMA would be gathered. Among other population management parameters, objectives may be identified for desired age structure and sex ratio, animal condition, phenotype, genetic diversity, population growth rate, or selective removal criteria. These objectives may be based on historical attributes or other management considerations." *Id.*

49. Monitoring objectives "measure the progress made toward achieving proposed habitat or population management objectives." *Id.*

50. An HMAP "shall include a resource monitoring plan and schedule that will be used to facilitate the timely and effective completion of habitat and population monitoring. The plan should identify the specific monitoring item, the methodology to be used, the resource specialty needed to complete the monitoring (e.g., field office WH&B specialist, rangeland management specialist, wildlife biologist, etc.), where and when monitoring should occur, as well as any actions to be taken to adjust or adapt management as needed and appropriate pending monitoring results." *Id.*, p. 42.

51. "Implementation objectives are management actions that, when implemented, are expected to make progress toward attaining the proposed habitat or population management objectives. These could include application of fertility control, adjustment of sex ratios to favor males, or other actions to slow population growth, management actions to assure genetic diversity or achieve the desired sex ratio or age structure for the [wild horse and burro] herd, or range improvement projects." *Id.*, p. 39.

52. In BLM's Report to Congress 2020, BLM said an HMAP "summarize[s] the management goals for an HMA and the anticipated actions required to achieve those goals… The process of developing and updating these plans would continue to provide the opportunity to inform and involve the public in determining the best actions to take on an HMA into the future. Just as with surveys and monitoring, HMAP development is a key component in the decision-making process for BLM's wild horse and burro management activities on the ground."

53. A gather plan is separate from an implementation objective in an HMAP, with gather plans tiering to the objectives in the HMAP. *Id.*, p. 44-45, 47, 56. BLM considers an HMAP an "activity plan" that informs implementation decisions, such as gather plans. *Id.*

**Gather Decisions**

54. The WHA directs the Secretary of the Interior to manage wild horses and burros "in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands." 16 U.S.C. § 1333(a). Further, [a]ll management activities shall be at the minimal feasible level." *Id.*

55. Among the management activities that BLM may engage are activities related to the gather and removal of wild horses from the public range. 16 U.S.C. §§1332(f), 1333(b). In making determinations regarding such removal, BLM must make both an overpopulation determination and a necessity determination. *Id.* at §1333(b); *W. Rangeland Conservation Ass'n v. Zinke*, 265 F. Supp. 3d 1267, 1281 (D. Utah 2017); *Wyoming v. United States DOI*, 839 F.3d 938, 944 (10th Cir. 2016).

56. In determining whether an overpopulation exists, BLM compares the current population to an HMA's AML. 16 U.S.C. §1333(b)(2). The definition of AML is the population range within which wild horses can be managed for the long term. 16 U.S.C. §1333(b)(2); *Downer v. BLM*, No. 20-CV-191-SWS, 2020 U.S. Dist. LEXIS 262323 at *5 (D. Wyo. Nov. 2, 2020).

57. AMLs must be established based on "evidence, analysis or studies*." Dahl v. Clark*, 600 F. Supp. 585, 592 (D. Nev. 1984). Such evidence, analysis or studies typically look at habitat requirements and the forage the agency allocates for wild horses, livestock, and wild animals. BLM cannot base its determination of AML solely on the wild horse population as it existed when the WHA was adopted.

58. Where BLM relies upon improper AMLs, any excess determination will necessarily violate the WHA. *Friends of Animals v. Sparks*, 200 F.Supp. 3d 1114, 1126 (D. Mont. 2016) ("By operating with an outdated AML when it [adopted a removal plan], [the government's] excess animal determination was based, at least in part, on pure guesswork. Without an accurate AML, [the government's] duty to remove could not be triggered because [the government] could not properly determine that an overpopulation existed, which is the prerequisite for removal"); *Animal Protection Institute of America*, 109 IBLA 112, 118 (1989) (decision to remove horses cannot be based on AMLs established "only for administrative convenience").

59. BLM recognizes that "[j]ustifying a removal based on nothing more than the established AML is not acceptable." H-4700-1 (BLM, 2010), p. 47. A necessity determination also is required.

60. A determination that removal of horses is necessary indicates that without removal, BLM cannot achieve and maintain a TNEB in coordination with other resources and activities. In analyzing TNEB, BLM can consider the health of the horses or other wildlife, as well as forage and water resource conditions. 16 U.S.C. §1333(b)(2); *In Def. of Animals v. United States DOI*, 751 F.3d 1054, 1062-63 (9th Cir. 2014); *Am. Wild Horse Pres. Campaign v. Jewell*, 847 F.3d 1174, 1179 (10th Cir. 2016); *Cloud Found. v. United States BLM*, 2013 U.S. Dist. LEXIS 43371 at *26 (D. Nev. Mar. 26, 2013).

61. In defining TNEB, BLM refers to management of wild horses and burros "in a manner that assures significant progress is made toward achieving the Land Health Standards

for upland vegetation and riparian plant communities, watershed function, and habitat quality for animal populations, as well as other site-specific or landscape-level objectives, including those necessary to protect and manage Threatened, Endangered, and Sensitive Species. H-4700-1 (BLM, 2010), p. 59.

62. Land Health Standards (sometimes referred to as Rangeland Health Standards and Guidelines) are "statements of physical and biological condition or degree of function required for healthy sustainable rangelands. Achieving or making significant progress towards these functions and conditions is required of all uses of public lands. Historical data, when available, should be utilized when assessing standards." *Id.*

63. Both HMAPs and gather plans can address thriving natural ecological balance (TNEB) and Land Health Standards. *Id.*, pp. 12, 17, 30, 36, 58, 79.

64. Land Health Standards "are intended to help the Bureau, public land users and others focus on a common understanding of acceptable resource conditions and the guidelines provide a basis for working together to achieve that vision." H-4180-1 - Rangeland Health Standards (BLM, 2001), p. I-1.

65. If Land Health Standards are not being met, BLM is to use monitoring data to identify "significant factors that contribute to failing to achieve the standards or conform with the guidelines." 43 CFR § 4180.2. Depending on what factors are significant, BLM can take a number of actions; the agency is not limited to removing wild horses and burros. *Id.*; *see also* H-4180-1, p. I-4 (identifying, for example, actions related to livestock grazing, vegetative treatments, or improvement projects).

66. If necessary to provide habitat for wild horses and burros, to implement herd management actions, or to protect wild horses and burros from disease, harassment or injury, the authorized officer may close areas of the public lands to grazing use by all or a particular kind of livestock. Closure to livestock grazing may be temporary or permanent. H-4700-1 (BLM, 2010), p. 9 (citing 43 CFR § 4710.5(c)).

67. Determining that removal of wild horses is necessary to preserve TNEB, BLM must do more than rely on a handful of visual observations in the HMA. Such "ocular estimation" is "little more than a guess," and therefore constitutes a "flawed methodolog[y]" for measuring TNEB. *Or. Wild Horse Org. v. U.S. Dep't of the Interior*, No. 2:24-cv-01673-HL, Dkt. 115, at 6 (D. Or. Oct. 15, 2026) (order granting preliminary injunction).

68. Courts have not found staged gather operations to be inherently in violation of the WHA; however, because the WHA requires gathers to occur "immediately," courts have found BLM must justify any delay in removing the targeted overpopulation by demonstrating that the practical realities of administration necessitated some delay. *Friends of Animals v. United States BLM*, 728 F.Supp.3d 45, 76-78 (D.D.C. 2024); *Friends of Animals v. Culver*, 610 F.Supp.3d 157, 168-71 (D.D.C. 2022); *W. Rangeland Conservation Ass'n v. Zinke*, 265 F.Supp.3d 1267, 1283-84 (D. Utah 2017). Further, once the targeted overpopulation has been removed, no further gathers may be conducted under an adopted staged gather plan. *Friends of Animals*, 728 F.Supp.3d at 76-78. Such "maintenance" gathers violate the WHA's requirements regarding new overpopulation and necessity determinations, as well as the need for interagency consultations before such determinations are made. *Id.*

**Humane Capture and Removal**

69. As regards wild horse gathers, the WHA also provides that excess horses must be "humanely captured and removed." 16 U.S.C § 1333(b)(2)(B) & (C). "The Secretary shall cause such number of additional excess wild free-roaming horses and burros to be humanely captured and removed for private maintenance and care for which he determines an adoption demand exists by qualified individuals, and for which he determines he can assure humane treatment and care (including proper transportation, feeding, and handling)." *Id.* at 140. The regulatory provisions of the WHA also prohibit any person from (1) maliciously or negligently injuring or harassing a wild horse or (2) treating a wild horse inhumanely. 43 C.F.R. § 4770.1.

70. "[H]umane treatment" is defined as "handling compatible with animal husbandry practices accepted in the veterinary community, without causing unnecessary stress or suffering to a wild horse or burro." 43 C.F.R. § 4700.0-5(e). "Inhumane treatment" is defined as "any intentional or negligent action or failure to act that causes stress, injury, or undue suffering to a wild horse or burro and is not compatible with animal husbandry practices accepted in the veterinary community." 43 C.F.R. § 4700.0-5(f).

71. Malicious treatment occurs through intentional acts that demonstrate a deliberate disregard for the well-being of wild horses. *See Mountain States Legal Found. v. Hodel*, 799 F.2d 1423, 1425 (10th Cir. 1986). "Such acts include, but are not limited to, unauthorized chasing, pursuing, herding, roping, or attempting to gather or catch wild free-roaming horses and burros." *Id.*; *see also* 1984 43 C.F.R. § 4700.0-5(k); 51 F.R. 7410.

**C. <u>National Environmental Policy Act</u>**

72. Prior to adopting an HMAP or gather plan, BLM must adhere to the provisions of NEPA. 42 U.S.C. § 4321 *et seq*.

73. As a threshold matter, NEPA requires agencies to consider whether a proposed action might conflict with the requirements or purpose of another statute. 40 CFR § 1501.1(a).

74. In assessing the appropriate level of NEPA review, agencies must determine whether to rely upon an Environmental Impact Statement (EIS) or an Environmental Assessment (EA). An EIS is appropriate for major actions that are likely to significantly affect the quality of the human environment. 42 U.S.C. § 4332(C); 40 C.F.R. § 1501.3(a). An EA is appropriate where there is not likely to be a significant effect or the significance of the effects is unknown. 40 C.F.R. § 1501.3(a).

75. Where an agency adopts a proposed action following development of an EIS, it may adopt a Record of Decision (ROD) to implement its decision. Through this ROD, the agency is legally bound to act as promised pursuant to the decision. *See* 43 C.F.R. § 1505.3; *Friends of Animals*, 200 F. Supp. 3d at 1123-25.

76. If an agency relies upon an EA and finds that the proposed action will not significantly affect the human environment, it may issue a finding of no significant impact (FONSI) in lieu of an EIS. *See* 40 C.F.R. § 1508.1(l); *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1239 (9th Cir. 2005).

77. A FONSI "briefly present[s] the reasons why an action … will not have a significant effect on the human environment and for which an [EIS] therefore will not be prepared." 40 C.F.R. § 1508.1(l).

78. Regardless of whether review involves an EIS or EA, NEPA requires federal agencies to take a "hard look" at environmental consequences before carrying out federal actions. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 373-74 (1989); *Dine Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1027 (10th Cir. 2023).

79. NEPA review requires that "every significant aspect" of the environmental effects of a proposed major federal action be made available to inform agency decisionmakers and the public so that both may "play a role in both the decision-making process and the implementation of" the action. *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983); *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

80. An EA's purpose and need statement are the foundation of a project and identify what the project is intended to accomplish, with the "need" explaining why proposed action is being considered and the "purpose" presenting a solution to the "need." National Environmental Policy Act (BLM, 2008), pp. 35-36. The purpose and need statement should be substantiated by evidence. *Westlands Water Dist. v. United States DOI*, 376 F.3d 853, 867 (9th Cir. 2004); *Coal. for the Advancement of Reg'l Transp. v. FHA*, 576 F. App'x 477, 488 (6th Cir. 2014); *Openlands, Midewin Heritage Ass'n v. United States DOT*, 124 F. Supp. 3d 796, 807 (N.D. Ill. 2015). Further, courts look to see whether a statement is drawn so narrowly as to prevent the decision-maker and the Court from assessing reasonable alternatives. *Klamath Forest All. v. United States Forest Serv.*, 2024 U.S. Dist. LEXIS 160369, at *4 (N.D. Cal. Aug. 23, 2024); *Westlands Water*

*Dist.,* 376 F.3d at 867. A statement of purpose and need "will fail if it unreasonably narrows the agency's consideration of alternatives so that the outcome is preordained." *Alaska Survival v. Surface Transp. Bd*., 705 F.3d 1073, 1084 (9th Cir. 2013).

81. "Establishing appropriate baseline conditions is critical to any NEPA analysis. 'Without establishing the baseline conditions which exist … before [a project] begins, there is simply no way to determine what effect the [project] will have on the environment and, consequently, no way to comply with NEPA.'" *Great Basin Res. Watch*, 844 F.3d 1095, 1101 (9th Cir. 2016) (citations omitted).

82. NEPA review requires consideration of direct, indirect, cumulative, and ecological impacts associated with a proposed action. *See* 40 C.F.R. § 1508.1(g); *Neighbors of Cuddy Mountain v. U.S. Forest Service*, 137 F.3d 1372, 1379 (9th Cir. 1998); *Sierra Club v. U.S. Army Corps of Engineers*, 645 F.3d 978, 991 (8th Cir. 2011).

83. While agencies may consider beneficial values of a proposed project, NEPA requires they not ignore adverse environmental effects. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).

84. "[I]n considering cumulative impact, an agency must provide 'some quantified or detailed information; . . . [g]eneral statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided.'" *Bark v. United States Forest Serv*., 958 F.3d 865, 872 (9th Cir. 2020) (quoting *Ocean Advocates v. United States Army Corps of Eng'rs*, 402 F.3d 846, 868 (9th Cir. 2004)). NEPA requires more than simply listing actions; substantive analysis must occur. *Id.; Klamath-Siskiyou Wildlands Ctr. v. BLM*, 387 F.3d 989, 996 (9th Cir. 2004); *Davis v. Mineta*, 302 F.3d 1104, 1110 (10th Cir. 2002).

85. NEPA also requires consideration of reasonable alternatives to ensure that the agency takes into account all possible approaches to and potential environmental impacts of a particular project. *N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 978 (9th Cir. 2006). The

"existence of a viable but unexamined alternative" constitutes a violation of NEPA. *Citizens for Better Henderson v. Hodel*, 768 F.2d 1051, 1057 (9th Cir. 1985).

86. Under NEPA, agencies must ensure the scientific integrity of the discussions and analyses in an EA or EIS. 42 U.S.C. § 4332(D); *Custer Cty. Action Ass'n v. Garvey*, 256 F.3d 1024, 1034 (10th Cir. 2001).

87. In reviewing a project under NEPA, agencies must do more than make "perfunctory" or "conclusory assertions." *Bark v. United States Forest Serv*., 958 F.3d 865, 872 (9th Cir. 2020); *see also WildEarth Guardians v. Mont. Snowmobile Ass'n*, 790 F.3d 920, 925-28 (9th Cir. 2015) (NEPA violated when agency failed to provide data about the location and concentration of winter ranges inhabited by big game, finding that "[w]ithout data on the location ..., the public was severely limited in its ability to participate in the decision-making process"); *N. Plains Res. Council, Inc. v. Surface Transp. Bd*., 668 F.3d 1067, 1083 (9th Cir. 2011) (NEPA requires agencies to provide the data on which they base their analysis); *Klamath-Siskiyou Wildlands Ctr. v. BLM*, 387 F.3d 989, 996 (9th Cir. 2004) (NEPA analysis inadequate when based on "generalized conclusory statements" supported only by "scant information"); *Davis v. Mineta*, 302 F.3d 1104, 1110 (10th Cir. 2002) (EA "is fatally flawed" when conclusions are "unsupported").

88. Because NEPA is intended to allow the public to participate in agency decision-making, BLM must reasonably respond to comments not adequately discussed in the draft statement. *Lands Council v. McNair*, 537 F.3d 981, 1001 (9th Cir. 2008); *Envtl. Health Tr. v. FCC*, 9 F.4th 893, 904-10 (D.C. Cir 2021).

89. When a NEPA reviewed project is adopted, the government cannot act upon the project in a manner that exceeds the scope of what was reviewed. *Friends of Animals*, 728 F.Supp.3d 45, 79-81 (D.D.C. 2024); *Friends of Animals v. United States BLM*, 2015 U.S. Dist. LEXIS 17575, No. 3:15-CV0057-LRH-WGC, at *3-4 (D. Nev. Feb. 11, 2015); *Or. Nat. Desert Ass'n v. McDaniel*, No. 3:09-cv-00369-PK, 2012 U.S. Dist. LEXIS 205376, at *14-26 (D. Or.

Sep. 28, 2012); *Price Rd. Neighborhood Ass'n v. United States DOT*, 113 F.3d 1505, 1510 (9th Cir. 1997). When the scope of a project changes based on new information or conditions, a new or supplemental EA is required. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 72-73 (2004); *N. Alaska Envtl. Ctr. v. United States DOI, Bureau of Land Mgmt.*, 983 F.3d 1077, 1093 (9th Cir. 2020).

90. When reviewing a project under NEPA, tiering to other documents that have not been subject to NEPA review is not permitted. *Kern v. United States BLM*, 284 F.3d 1062, 1073 (9th Cir. 2002).

91. Where an agency has predetermined the outcome, the requirements of NEPA are not fulfilled. *Metcalf v. Daley*, 214 F.3d 1135 (9th Cir. 2000) (agency predetermination is improper as it shows the environmental analysis was "a subterfuge designed to rationalize a decision already made"); Forest Guardians v. United States Fish & Wildlife Serv., 611 F.3d 692 (10th Cir. 2010) (predetermination of NEPA analysis indicates agency "failed to take a hard look at the environmental consequences of its actions due to its bias in favor of that outcome, and therefore, has acted arbitrarily and capriciously").

**D. <u>APA</u>**

92. Section 706(1) of the APA provides that courts shall compel agency action unlawfully withheld or unreasonably delayed.

93. Sections 706(2)(A) through (D) of the APA, which apply to all cases involving agency action, *see Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 414 (1971), provide:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall …
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—

> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> (B) contrary to constitutional right, power, privilege, or immunity;
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
> (D) without observance of procedure required by law …

94. In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error 5 U.S.C. § 706(2).

95. In determining whether agency action is arbitrary and capricious, judicial review requires a "searching and careful" inquiry into the factual basis of an agency's decision. *Citizens to Pres. Overton Park, Inc.*, 401 U.S. at 416; *see also Eagle Broad. Grp., Ltd. v. FCC*, 563 F.3d 543, 551 (D.C. Cir. 2009). Agency action will be found to be arbitrary and capricious where it has failed to consider an important aspect of the matter, ignored evidence contradicting its position, or minimized evidence without adequate explanation. *Daikin Applied Ams. Inc. v. Env't Prot. Agency*, 39 F.4th 701, 711-12 (D.C. Cir. 2022) (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983); *Genuine Parts Co. v. EPA*, 890 F.3d 304, 312 (D.C. Cir. 2018); *Butte County v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010)).

96. An agency decision also may be arbitrary and capricious where the decision is based on distorted or contradictory calculations or where agency calculations exclude relevant factors without explanation. *Native Ecosystems Council v. United States Forest Serv.*, 418 F.3d 953, 964-65 (9th Cir. 2005); *Envtl. Def. v. United States Army Corps of Eng'rs*, 515 F.Supp.2d 69, 82 (D.D.C. 2007); *SWAN View Coal. v. Haaland*, 2024 U.S. Dist. LEXIS 114625, at *17 (D. Mont. June 28, 2024); *Ctr. for Biological Diversity v. Bernhardt*, 595 F.Supp.3d 890, 916-17 (D. Ariz. 2022). "Result-oriented manipulation" of data for the purposing of making calculations also "is patently arbitrary and capricious." *Tenn. Gas Pipeline Co. v. FERC*, 926 F.2d 1206, 1207 (D.C. Cir. 1991).

97. Although an agency's handbooks, manuals, and technical reference documents do not create mandatory duties, where the plain language of such documents establishes how an agency is to act, and such action does not contradict duties established by statute or regulation, the failure of an agency to abide by such plain language is arbitrary and capricious unless the agency identified a reasonable basis for this failure. *Healey v. McDonough*, 33 Vet. App. 312, 321 (U.S. 2021); *WildEarth Guardians v. Zinke* 2019 U.S. Dist. LEXIS 30357, at *40-41 (D. Mont. Feb. 11, 2019); *Dine Citizens Against Ruining Our Env't v. Klein*, 747 F. Supp. 2d 1234, 1253 (D. Colo. 2010); *Rhodes v. Johnson*, 153 F.3d 785, 789-90 (7th Cir. 1998); *Auer v. Robbins*, 519 U.S. 452 (1997); *United States v. Heffner*, 420 F.2d 809, 811-13 (4th Cir. 1969).

## STATEMENT OF FACTS

98. The Jackson Mountains Horse Management Area (HMA) spans 264,974 acres located in Humboldt County, Nevada.

99. The Jackson Mountain wild horses descend from horses brought to North America by Spanish conquistadors in the 15th and 16th centuries who later mixed with horses brought by settlers, miners, and ranchers during the Westward expansion of the United States.

100. The horses adapted to the rugged high-desert landscape and were called "mustangs" from the Spanish "mesteño," meaning "ownerless" or "wild." They became symbols of the American spirit and love of freedom. Due to their cultural importance, they are now under federal protection (the WHA).

101. The wild horses run free on the HMA, exploring, socializing, maintaining kin groups, foraging on plants, and raising foals. Elder horses carry the cultural memory of the herd through retained memory of the landscape – where to forage, where to hide from predators, where to find water.

102. Wild horses benefit the land by grazing on plants that would otherwise become kindling for wildfires, thereby reducing the fire fuel load where they roam.

103. BLM allows the HMA to be grazed by domestic livestock, and approximately nine livestock permittees operate in the area.

104. The Jackson Mountains Allotment (land designated by BLM for livestock grazing for domestic cattle and sheep) overlaps nearly the entire Jackson Mountains HMA.

105. BLM allows livestock, not wild horses, the majority of the grazing on the HMA. In the Jackson Mountains Allotment, which includes the Jackson Mountains HMA, the Animal Unit Months (amount of forage for one animal) is approximately 8,857 for livestock and 840-1,404 for wild horses, meaning wild horses have 84.1-90.5% less forage than livestock on the HMA.

106. The wild horses' habitat in the HMA is under constant threat from two industries: livestock and mining, which significantly impact forage and water resources.

107. Past and future mining also presents a substantial threat to wildlife on the HMA. Junior exploration companies hold thousands of active mining claims across the range. Drill pads, fences, and high-clearance roads cut through public lands and fragment habitat.

108. Historical mining has left lasting damage to the land. Legacy sites including the DeLong, or Iron King, Mine include open pits, unstable tailings piles, degraded soils, and other hazards. These sites reduce the amount of viable, nutrient-rich range available to wild horses and wildlife.

109. This infrastructure, along with the mountain range, separates the wild horses of the HMA into distinct northern and southern herds. *There is no interchange between the herds*.

110. In the past, BLM acknowledged that the HMA contains two separate herds. BLM said this fact would be addressed when the agency prepared an HMAP; however, the Jackson Plan ignores that the two herds are distinct.

111. The HMA also faces environmental threats beyond its boundaries. Large regional developments, including the Thacker Pass Lithium Mine roughly 45 miles northeast of the HMA, add to the cumulative industrial footprint.

112. Increased heavy-truck traffic along regional corridors, particularly State Highway 140 along the HMA's northern boundary, also raises collision risks as horses search for food and water.

113. The Jackson Mountains Plan is an HMAP that incorporates by reference a gather plan adopted on May 31, 2022 ("2022 Gather Plan"). In doing so, BLM reverses the relationship between management planning and implementation: an HMAP establishes objectives that guide gather actions, not the other way around.

114. Where BLM excluded reconsideration of AML and other foundational management objectives from the 2022 Gather Plan's scope, that decision cannot supply the analysis or justification for treating those same objectives as fixed in the HMAP. Management objectives must guide implementation; prior implementation decisions cannot substitute for the management analysis needed to establish or evaluate those objectives. See BLM Handbook H-4700-1, §§ 2.4.1, 2.5, 2.5.2, and 4.2.2.

115. The Jackson Mountains Plan lacks the site-specific analysis and SMART objectives required when creating an HMAP. It functions only to establish the agency's predetermined objectives of removing and sterilizing wild horses without consideration of site-specific facts and without consideration of the HMA's multiple use.

116. The environmental assessment for the Jackson Mountains Plan considered three alternatives, as well as a "no action" alternative. Alternative A, which was adopted, reaffirms the HMA's AML of 130-217 and provides for management of the wild horses using growth suppression methods, with approximately 1/3 of the wild horses managed as non-reproducing. Alternatives B and C are identical except that Alternative B does not maintain a permanent non-reproducing population and Alternative C does not authorize fertility control.

117. BLM also identified alternatives that were identified as not being assessed for further consideration. Among these alternatives were plans that provide for changes in livestock use of the HMA, re-assessment of AML, and supplementation of forage and water in the HMA.

118. The 2022 Gather Plan and Jackson Mountains Plan rely upon an AML of 130-217 wild horses for the HMA's 264,974 acres. In the Jackson Mountains Plan, BLM states that this AML was established through prior decision-making processes (including through allotment-specific Final Multiple Use Decisions in the mid-1990s), and re-affirmed through the Winnemucca District Resource Management Plan (2015). Neither the 2022 Gather Plan, Winnemucca District Resource Management Plan, prior decision-making processes, nor the Jackson Mountains Plan contain any underlying data, analysis, or calculations substantiating this AML.

119. In communications between BLM and Plaintiffs, BLM acknowledged that the agency was not in possession of any site-specific data relied upon for creation of the 130-217 AML.

120. Earlier documentation reveals that this AML was administratively set in the 1980s, without any site-specific analysis or study.

121. The AML for the Jackson Mountains HMA also fails to consider the fact that the HMA contains two wild horse populations that have no interchange between them.

122. With the 2022 Gather Plan, BLM estimated the wild horse population as 451, relying upon a 20% annual growth rate for this determination. With the Jackson Mountains Plan, BLM estimated the wild horse population as 679, relying upon a 17% annual growth rate for this determination.

123. BLM has never determined the actual annual growth rate for the wild horses of the Jackson Mountains HMA. The agency instead arbitrarily applies a 17%-20% growth rate without any site-specific data, including but not limited to data addressing the impact of drought, forage conditions, and survival on population growth rates. As a result, BLM's application of a 17% or 20% growth rate to assess overpopulation is nothing more than guesswork.

124. The National Research Council recognized that population growth varies with environmental conditions and cautioned that estimates based on unmeasured growth rates may

be assumptions or "best guesses." Without reliable population surveys over time (including pre- and post-gather surveys to evaluate population estimates and the number remaining), BLM has not demonstrated that its estimated population projections reflect this herd's actual population dynamics. BLM should disclose this uncertainty and evaluate lower-growth scenarios rather than treat 17% or 20% percent as an established herd-specific rate.

125. An HMAP is the appropriate vehicle for analyzing site-specific AML and annual growth rate. HMAPs should not tier to pre-existing plans that fail to address the current, site-specific conditions of an HMA.

126. After adoption of the 2022 Gather Plan, BLM conducted an emergency gather of 35 horses. After adoption of the Jackson Mountains Plan, BLM conducted a gather from September 20-28, 2026. This gather resulted in the permanent removal of 504 wild horses from the HMA. At least seven wild horses died during the gather operations.

127. As BLM estimated the wild horse population to be 679 prior to the 2026 gather operations, the population after removing 504 wild horses is 175 wild horses. This population falls within the AML for the HMA, and as such, no further gather operations can occur without BLM making future excess and necessity determinations. To the extent BLM intends to rely upon the Jackson Mountains Plan to conduct future maintenance gathers, the WHA is violated.

128. The Jackson Mountains Plan fails to establish monitoring conditions or "triggers" by which BLM is to re-assess AML, TNEB, forage allocation, critical habitat protection, water improvements, recreation/tourism, and more.

129. According to BLM, wild horses are in direct competition with domestic livestock for forage and water. BLM does not quantify – qualitatively or quantitatively – the degree to which each threaten TNEB. BLM makes no attempt to assess or identify the appropriate multiple use and sustained yield for each of the HMA's resources.

130. BLM relies upon flawed methodologies – ocular estimation of forage, i.e., a guess – to measure available forage and claim that wild horses, not livestock, are responsible for impacts to TNEB.

131. BLM states that wild horses degrade the soil on the HMA, but it does not support this claim with current data specific to the HMA. BLM does not analyze the effect of livestock on the soil of the HMA.

132. BLM states that wild horses harm the sage grouse and bird populations on the HMA, but it does not support this claim with current data specific to the HMA. BLM does not analyze whether livestock harm the sage grouse and bird populations on the HMA.

133. BLM states that wild horses damage water resources by their grazing habits on the HMA, but it does not support this claim with current data specific to the HMA. BLM does not analyze whether livestock damage water resources by their grazing habits on the HMA.

134. Cattle grazing habits are far more detrimental to water resources than those of horses. Wild horses forage further from water sources than domestic cattle.

135. BLM attributes water shortages on the HMA to wild horse – not livestock – use. BLM does not analyze whether livestock have reduced or threatened the water supplies in the HMA.

136. BLM extensively attributes habitat damage to wild horses, without site-specific data, but does not evaluate habitat damage by livestock.

137. Despite acknowledging the presence of mining interests in the south of the HMA, the HMAP never analyzes the comparative threat of mining to the HMA ecosystem.

138. The Jackson Mountains Plan does not address the fact that the northern and southern herds are distinct, with each having different cover, space, forage and water.

139. All past emergency gathers in the HMA occurred due to forage and water availability issues in the Southeast corner of the Jackson Mountains HMA, where there is heavy

livestock presence and drought. The Jackson Mountains Plan does not analyze or determine whether livestock usage in this area needs to be lowered or eliminated during times of drought.

140. In addressing TNEB, the Jackson Mountains Plan does not include any site-specific discussion of the beneficial impact of wild horses in reducing combustible forage.

141. BLM's Purpose and Need Statement for the Jackson Mountains Plan is as follows:

> The BLM's purpose is to consider adopting an HMAP consistent with the authority provided in the regulations that implement the WFRHBA at 43 CFR Part 4700 in order to restore and maintain the TNEB by maintaining wild horse populations within the established AML ranges for the HMA. The BLM's need is to prevent undue or unnecessary degradation of the public lands associated with wild horses above AML, and to restore a TNEB and multiple-use relationship on public lands, consistent with the Federal Land Policy and Management Act of 1976 as amended (FLPMA) and the WFRHBA.

142. The purpose and need statement is unsubstantiated and too narrowly drawn. The statement also contains no identified issues from BLM's management evaluation for an HMAP, as required by BLM's own policies.

143. BLM did not establish the necessity for the removal of wild horses as the agency's documentation. The agency's conclusion that necessity exists is made without data indicating that range conditions are being threatened by wild horses or that removal of wild horses will improve range conditions.

144. With the Jackson Mountains Plan, BLM made inconsistent statements and confusing directions to the public about where to find documentation underlying the HMA's AML and range conditions. This resulted in thwarting public participation and agency accountability.

145. Alternative A, BLM's adopted course of action, allows sterilization through of up to about one-third of the population at low AML. It is unclear how many horses will be sterilized, with BLM indicating 33 or 43 horses. No information is provided regarding the number of mares versus the number of stallions to be sterilized.

146. BLM claims sterilization is necessary to prevent future overpopulation but provides no data or calculation for why sterilizing *one-third* of the remaining herd is necessary or sufficient to avoid overpopulation. The selection of sterilization methods and the goal of sterilizing one-third of the population is arbitrary.

147. In addressing sterilization, the Jackson Mountains Plan allows for "endoscopic oviduct ablation," which infuses glue into the oviduct. According to BLM's documents, in this procedure, treated mares stand in a hydraulic chute while the veterinarian passes an endoscope into the vaginal vault and through the cervix. A veterinary team is required to manipulate and operate the endoscope monitor, insert and hold the endoscope, manipulate and position the fine-tipped catheter into the oviduct, and infuse the fluid into the oviduct. The uterus is partially inflated and a sterile catheter is guided to each entrance to the oviduct, and the veterinarian inserts medical-grade glue (N-butyl cyanoacrylate) into the oviduct, where it causes blockage. The sterilized mares need to be held for observation by veterinarians for 10-14 days after the procedure.

148. The Jackson Mountains Plan also authorizes laser ablation of the oviduct papilla. BLM describes this procedure as applying heat to scar the uterotubal junction to prevent eggs from reaching the uterus. The scar tissue creates a blockage.

149. Transcervical procedures can terminate a pregnancy, so mares must be screened.

150. Mares chosen for the sterilization procedure could include adult females and immature females as young as 8 months. BLM does not analyze how medical procedures and significant handling by veterinary teams might harm the wild horses, especially the youngest.

151. The Jackson Mountains Plan also expressly leaves open sterilization methods (including experimental surgical options) not specifically addressed in the plan's environmental assessment (but mentioned in the plan's appendix.

152. The appendix endorses ovariectomy via colpotomy, an invasive surgery to remove the ovaries, as a "good choice" for sterilizing wild horses.

153. Ovariectomy via colpotomy involves a veterinarian inserting their arm into a mare's abdominal cavity through an incision in the vaginal wall, manually locating the ovaries, then twisting, severing, and removing them using a rod-and-chain tool called an ecraseur.

154. When used infrequently for domestic mares, it requires adequate anesthesia and rigorous post-operative care including pain relief, antibiotics, and stall confinement that cannot be provided to wild, untamed horses. Potential side effects include pain and discomfort; injuries to the cervix, bladder, or a segment of bowel; delayed vaginal healing; eventration of the bowel; incisional site hematoma; intraabdominal adhesions to the vagina; and chronic lumbar or bilateral hind limb pain.

155. The main reason the procedure is performed in domestic horses is to alter their behaviors, something that is harmful to wild horses whose natural free-roaming behaviors allow them to survive in the wild.

156. The Jackson Mountains Plan also discusses a second surgical ovary removal method, ovariectomy via flank laparoscopy. This procedure involves cutting into the horse's flank and using a camera and small instruments to remove the ovaries. Like ovariectomy via colpotomy, this procedure is normally used to alter the behavior of horses exhibiting unruly behavior. The procedure would require 2 weeks of holding the wild horses for monitoring.

157. Ovary removal by either method risks not only the invasiveness of the procedure and side effects, but altering the personalities and behavior of wild horses to become more docile.

158. Male horses selected for sterilization would be castrated, a procedure that risks side effects such as behavioral changes, bleeding, swelling, inflammation, edema, infection, peritonitis, hydrocele, penile damage, excessive hemorrhage, and eventration.

159. The Jackson Mountains Plan states that no further veterinary intervention is possible after release, and that monitoring will be by casual observation at most, leaving wild horses vulnerable to untreated side effects out on the range.

160. BLM does not analyze the impact of the plan's highly invasive sterilization procedures on the wild, free-roaming nature of the horses.

161. BLM also fails to analyze less invasive alternatives. BLM rejects remote darting with birth control vaccines as "unreliable," and directs the reader to the "alternatives" section for further analysis of this option but does not include any further analysis of this option in that section.

162. The use of ablation and surgical procedures is experimental. Previous experimental use of these procedures have been found to be a failure, but BLM ignores this evidence.

163. The Jackson Plan does not provide for First Amendment viewing of the sterilization procedures for advocates to monitor the proceedings. This is necessary to ensure the safety of the wild horses during any intensive medical procedures.

164. For the September 2026 gather, which was implemented pursuant to the Jackson Mountains Plan, BLM told Plaintiffs that none of the wild horses removed from the HMA would be sterilized.

165. Gather operations often result in wild horse deaths and cause irreparable psychological and physical stress for the horses that survive. The Jackson Mountains Plan acknowledges the potential of stress and injury. BLM is aware the risk is far higher than mere stress and injury and can cause trauma to wild horses from which they never recover.

166. BLM acknowledges that gather operations also disrupt other wildlife and humans with noise, flying debris, sudden stampedes of horses causing trampling, and disturbance to birds in nesting season.

167. The Jackson Mountains Plan sets a minimum heterozygosity of 0.66. Once inbreeding occurs in a wild horse herd, it takes many years for the herd to recover its heterozygosity. BLM's actions risk long-term damage to the genetic health of the herd and threaten it with collapse.

168. BLM does not analyze whether its proposed fertility measures – conducting removal-style gathers with traps and helicopters, extensive medical handling, and invasive, even life-threatening procedures – are the minimum level of management.

169. HMAPs can and do create water improvement projects. Additionally, BLM allows hauling of water for cattle instead of removing cattle in similar circumstances. However, neither of these options are discussed as viable alternatives for wild horses in the Jackson Plan.

170. BLM states it has completed unspecified range improvements on the HMA to provide more water for wild horses in the past. BLM has completed water improvements in other HMAs and HMAPs as well.

171. Yet, BLM now arbitrarily claims providing additional water to the wild horses during droughts would exceed the minimum feasible level of management and harm the horses' wild and free-roaming nature.

172. While it states that providing additional water would harm wild horses' wild and free-roaming nature, BLM does not analyze whether its proposed fertility measures – conducting removal-style gathers with traps and helicopters, extensive medical handling, and invasive procedures – will harm the horses' wild and free-roaming nature.

173. BLM did not take a hard look at the impact of using sterilization, as opposed to other measures, on the Jackson Mountains horses.

174. BLM did not adequately address alternative actions.

175. BLM did not take a hard look at direct, indirect, and cumulative impacts.

176. BLM did not adopt appropriate mitigation measures.

177. The scope of the Jackson Mountains Plan is ambiguous, at best. To the extent BLM interprets the Jackson Mountains Plan to allow for maintenance gathers once low AML has been reached, BLM will violate the WHA's requirements regarding determinations of population and necessity, as well as the WHA's requirement regarding consultation. Such

removal also would violate NEPA, which requires that new or supplemental EAs are prepared when the scope of the original analysis is exceeded or changed.

178. The Jackson Mountains Plan adopts a predetermined outcome in violation of NEPA.

**FIRST CAUSE OF ACTION**
**WHA and APA, 5 U.S.C. § 706(2)**

179. Plaintiffs hereby incorporate all previous allegations contained in this Complaint as though fully set forth herein.

180. Defendants have a mandatory duty to prepare a HMAP for each HMA. 43 C.F.R. § 4710.4.

181. The process for developing an HMAP and identification of HMAP components are defined by BLM's Wild Horses and Burros Management Handbook. BLM did not adhere to this process nor include necessary HMAP components in the Jackson Mountains Plan. BLM offered no reasonable justification for not adhering to the Handbook's guidance and rules.

182. In incorporating a previous gather plan by reference in its entirety and authorizing future gathers in line with that gather plan to facilitate the fertility suppression program in the HMAP, Defendants violated the WHA's requirements regarding determination of excess wild horses and determination that a gather of this population is necessary.

183. In incorporating a gather plan into the Jackson Mountains Plan and providing that future gathers will follow its guidelines when facilitating the HMAP, Defendants have violated the immediacy requirement of the WHA.

184. To the extent Defendants interpret the Jackson Mountains Plan as allowing for maintenance gathers, Defendants violate the WHA's requirements regarding excess and necessity determinations, as well as the WHA's requirement regarding consultation.

185. Defendants' incorporation of the 2022 Gather Plan violates the WHA and BLM's accompanying rules because a gather plan should tier to an approved HMAP.

186. Defendants' reliance on AMLs that were administratively set violates the WHA.

187. BLM's AML of 130-217 horses violates 16 U.S.C. § 1333(b)(1)'s current inventory requirement.

188. BLM failed to provide any calculation or current data justifying the specific AML relied upon for its determination of excess horses justifying gathers and sterilization.

189. BLM failed to establish an overpopulation exists because the agency's estimated population calculations rely upon a growth rate that is unsubstantiated by data and analysis.

190. BLM failed to establish an overpopulation exists because the agency's calculations ignore current data.

191. As such, BLM violated the Wild Horse Act's requirement that the agency demonstrate excess horses exist in the HMA.

192. BLM failed to demonstrate that it is necessary to remove horses in the Jackson Mountains HMA.

193. BLM failed to consult with U.S. Fish and Wildlife Service and its state equivalent as required by the WHA.

194. Defendant's actions have injured Plaintiffs in the manner described in this Complaint.

195. The Administrative Procedure Act gives this court authority to hold unlawful and set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

196. The Administrative Procedure Act gives this Court authority to hold unlawful and set aside agency action found to be "without observance of procedure required by law." 5 U.S.C.§ 706(2)(D).

//

//

//

**SECOND CAUSE OF ACTION**
**WHA and APA, 5 U.S.C. § 706(1)**

197. Plaintiffs hereby incorporate all previous allegations contained in this Complaint as though fully set forth herein.

198. Defendants have a mandatory duty to prepare an HMAP for each HMA. 43 C.F.R. § 4710.4.

199. The process for developing an HMAP and identification of HMAP components are defined by BLM's Wild Horses and Burros Management Handbook. BLM did not adhere to this process nor include necessary HMAP components in the Jackson Mountains Plan.

200. Defendants have unlawfully withheld or unreasonably delayed the preparation and adoption of an HMAP that complies with the WHA.

201. Defendant's actions have injured Plaintiffs in the manner described in this Complaint.

202. The Administrative Procedure Act provides that this Court "shall compel agency action unlawfully withheld or unreasonably delayed. 5 U.S. C. § 706(1).

**THIRD CAUSE OF ACTION**
**FLPMA, WHA and APA, 5 U.S.C. § 706(2)**

203. Plaintiffs hereby incorporate all previous allegations contained in this Complaint as though fully set forth herein.

204. Defendants did not comply with their multiple use and sustained yield mandate.

205. BLM attributed harms to forage, soil, water, and other wildlife on the HMA to wild horses, but failed to evaluate the role of livestock and mining.

206. By ignoring multiple use and sustained yield, the Jackson Mountains Plan's objectives and procedures are unconnected to rangeland health. The Plan contains no evidence to substantiate that the Plan's objectives and procedures will result in any change to TNEB.

207. Defendant's actions have injured Plaintiffs in the manner described in this Complaint.

208. The Administrative Procedure Act gives this court authority to hold unlawful and set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

209. The Administrative Procedure Act gives this Court authority to hold unlawful and set aside agency action found to be "without observance of procedure required by law." 5 U.S.C.§ 706(2)(D).

**FOURTH CAUSE OF ACTION**
**WHA and APA, 5 U.S.C. § 706(2)**

210. Plaintiffs hereby incorporate all previous allegations contained in this Complaint as though fully set forth herein.

211. Defendants have a duty to humanely capture and handle wild horses under the WHA and BLM's own policies.

212. BLM's sterilization plan violates the WHA's humaneness requirement by subjecting the horses to unnecessary physical and psychological suffering from removal-style gathers with traps and helicopters, significant handling by veterinary teams, invasive medical procedures including surgical procedures, long holding periods after the procedure, the likelihood of experiencing untreated side effects once back on the range, and behavioral changes from castration or ovary removal.

213. BLM's drastic proposed sterilization would inflict unnecessary suffering on one-third of the remaining wild horses by subjecting them to permanent sterilization without any factual basis for the procedures' necessity.

214. BLM's proposed sterilization plan would also inflict unnecessary suffering by threatening the herd's genetic heterozygosity, which inhumanely and needlessly risks

unnecessary suffering from health problems caused by inbreeding and significant population recovery time once heterozygosity is lost.

215. BLM's approval of the HMAP with this inhumane fertility suppression plan was arbitrary and capricious, an abuse of discretion, contrary to law, and without observance of procedure required by law.

216. BLM's actions have injured Plaintiffs in the manner described in this Complaint.

217. The Administrative Procedure Act gives this court authority to hold unlawful and set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

218. The Administrative Procedure Act gives this Court authority to hold unlawful and set aside agency action found to be "without observance of procedure required by law." 5 U.S.C.§ 706(2)(D).

**FIFTH CAUSE OF ACTION**
**NEPA and APA, 5 U.S.C. § 706(2)**

219. Plaintiffs hereby incorporate all previous allegations contained in this Complaint as though fully set forth herein.

220. BLM violated NEPA when it failed to analyze every significant aspect of the environmental impacts of removing wild horses from the Jackson Mountains HMA as alleged herein, including by (1) failing to analyze all direct, indirect, and cumulative impacts, (2) failing to disclose relevant information and data to decision-makers and the public, (3) failing to reasonably respond to public comment, (4) relying on an unsubstantiated and narrowly drawn purpose and need statement, (5) failing to establish baseline conditions, (6) failing to analyze reasonable alternatives, (7) failing to ensure scientific integrity in the agency's analysis, (8) tiering to documents that had not been reviewed under NEPA, and (9) adopting a predetermined outcome.

221. To the extent Defendants interpret the HMAP to allow maintenance gathers, Defendants violate NEPA's requirements regarding action being limited to the scope of analysis.

222. Plaintiffs have been injured in the manner described in this Complaint by Defendants' decision to adopt the Jackson Mountains Plan.

223. Plaintiffs ask this Court to vacate and set aside the Jackson Mountains Plan, and its associated Finding of No Significant Impact and Decision Record, as the decision to adopt this Plan was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and/or without observance of procedure required by law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully requests that this Court:

1. Issue an order and injunction compelling Defendants to immediately stop any implementation of the Jackson Mountains Plan until Defendants have fully complied with the Wild Free-Roaming Horses and Burros Act, National Environmental Policy Act, the Federal Land Policy and Management Act, and Administrative Procedure Act;
2. Vacate and set aside the Jackson Mountains Plan and its associated Decision Record and Finding of No Significant Impact;
3. Issue a declaration that BLM may not engage in maintenance gathers;
4. Maintain jurisdiction over this action until Defendants are in compliance with the Wild Free-Roaming Horses and Burros Act, the Federal Land Policy and Management Act, the Administrative Procedure Act, the National Environmental Policy Act, and every order of this Court;
5. Issue an order compelling Defendants to prepare an HMAP for the Jackson Mountains Plan that complies with the Wild Free-Roaming Horses and Burros Act;
6. Award Plaintiffs attorney fees and costs pursuant to and 28 U.S.C. § 2412; and

//

//

//

7. Grant such additional and further relief to which plaintiffs may be entitled.

DATED: November 18, 2026

Respectfully Submitted,

*/s/ Brent M. Resh*
BRENT M. RESH
(Nevada Bar No. 14940)
BRENT RESH LAW, PLLC
2401 La Solana Way
Las Vegas, NV 89102
(702) 781-6903
brent@brentreshlaw.com

*/s/ Jessica L. Blome*
Jessica L. Blome
(Cal. Bar No. 314898, pro hac vice forthcoming)
J. Rae Lovko
(Cal. Bar No. 208855, pro hac vice forthcoming)
GREENFIRE LAW, PC
2748 Adeline Street, Suite A
Berkeley, CA 94703
(510) 900-9502
jblome@greenfirelaw.com
rlovko@greenfirelaw.com

*Attorneys for Plaintiffs*